**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FREDDIE ADAMS, et al.,<br>　　　Plaintiffs,<br><br>v.<br><br>BRG SPORTS, INC., et al.,<br>　　　Defendants. | Case No.: 1:17-CV-08972 |
| JAMES BRADSHAW, et al.,<br>　　　Plaintiffs,<br><br>v.<br><br>BRG SPORTS, INC., et al.,<br>　　　Defendants. | Case No.: 1:18-CV-00129 |
| CORY BRANDON, et al.,<br>　　　Plaintiffs,<br><br>v.<br><br>BRG SPORTS, INC., et al.,<br>　　　Defendants. | Case No.: 1:17-CV-08544 |
| JEFFREY JONES, et al.,<br>　　　Plaintiffs,<br><br>v.<br><br>BRG SPORTS, INC.,<br>　　　Defendant. | Case No.: 1:18-CV-07250 |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO EXCLUDE**
**PLAINTIFF'S CAUSATION EXPERT RANDALL BENSON, M.D.**

## INTRODUCTION

Dr. Benson's recent deposition testimony, while revealing that plaintiffs' misconduct in connection with his designation and disclosure here warrants dismissal as a terminating sanction, also forecloses plaintiffs from using his testimony to establish causation—both general and specific.[1] Dr. Benson revealed that he did not author the seven purported case-specific reports plaintiffs served on Riddell. And contrary to the representations in those reports and plaintiffs' filings, he did not review any plaintiff's medical records or generate any case-specific causation opinions. Dr. Benson also admitted that the guts of his general causation report (which the purported specific causation reports largely duplicated) were not written by him, were largely copied by plaintiffs' counsel from their complaint, and did not reflect opinions expressed in Dr. Benson's prior writings. Finally, Dr. Benson testified he had not been provided and had not reviewed the twenty-three articles listed in an exhibit to his report, despite plaintiffs' contrary claims in multiple court filings. In short, Dr. Benson's deposition confirmed that the "opinions" expressed in his putative general causation report are those of counsel, not an expert.

All other considerations aside, Dr. Benson's testimony shows why plaintiffs cannot offer *Daubert*-worthy specific causation opinions to get the issue to a jury. As the Court observed, the reports themselves "each include identical content" and don't even reference the individual plaintiffs except on the title pages.[2] Yet, as the Court further observed, specific causation "must be determined . . . on a plaintiff-by-plaintiff basis."[3] Moreover, Dr. Benson cannot make up for the facially insufficient reports with testimony later because he did not even review plaintiffs' medical records, let alone examine or interview any plaintiff. He did not apply his typical

---

[1] (*See* Riddell's Mot. & Supporting Mem. to Dismiss on Terminating Sanctions (Defs.' Terminating Sanctions Mot.) (Sept. 2, 2021), ECF Nos. 417 & 418.)

[2] (Mem. Op. & Order 7 (Apr. 17, 2021), ECF No. 409.)

[3] (Mem. Op. & Order 7 (Oct. 5, 2018), ECF No. 182.)

methodology to assess any plaintiff's alleged neurological injury, and he expressly disclaimed forming any specific causation opinions about any of their claims.

Besides dooming their specific causation claims, Dr. Benson's recent deposition testimony also pulls the rug out from under plaintiffs' general causation claims, including their *Daubert* defense of Benson's purported general causation opinions. The Court already has determined, in line with Seventh Circuit law, that causation in these cases requires expert testimony. But we now know that the general causation report plaintiffs served contained the allegations of counsel, not any well-formed opinions from Dr. Benson. Indeed, the sum total of Dr. Benson's time spent on plaintiffs' cases before his general causation report was drafted and served was one-half hour, which was spent on a phone call with plaintiffs' counsel. Whether Dr. Benson *could have* provided any reliable opinions meeting Rule 702 and *Daubert* standards is not the issue. The fact is, he did not. Plaintiffs thus are left with no expert to testify on the threshold issue of general causation.

Plaintiffs' attempt to evade the case-dispositive impact of Dr. Benson's deposition revelations is unavailing. In response to Riddell's sanctions motion, they have submitted a barebones affidavit from him purporting to repudiate, without explanation, detailed and specific deposition admissions about his lack of involvement in drafting the reports.[4] As Riddell addresses in its reply, Dr. Benson's declaration only highlights plaintiffs' pattern of doubling down on their misrepresentations to opposing counsel and the Court. The same is true of plaintiffs' excuses that Dr. Benson was "mistaken" and "confused," and couldn't recall his supposed work, opinions, or reports.[5] More realistically, Dr. Benson's sworn testimony that he had no case-specific opinions, had never seen his case-specific reports, and found portions of them "troubling" and "false" were

---

[4] (Ex. B to Pls.' Resp. & Mem. to Riddell's Mot. to Dismiss on Terminating Sanctions (Pls.' Resp. Mem.) (Sept. 24, 2021), ECF No. 421-2.)
[5] (Pls.' Resp. Mem. 7, 17).

consistent with his other admissions, his billing records, and his barebones file materials. Plaintiffs' efforts to recant Dr. Benson's damning testimony also highlight the unreliability of his putative opinions. For example, Dr. Benson's declaration notably does not refute his admission that, contrary to plaintiffs' repeated representations to the Court and Riddell, Dr. Benson has never reviewed and relied on any plaintiffs' medical records. That testimony alone should end the inquiry on specific causation.

In sum, the Court should exclude Dr. Benson on specific causation. And given the recent revelations as to the bogus nature of his purported general causation report, Riddell also respectfully asks the Court to reconsider and vacate its prior finding that "Dr. Benson's report is sufficient to permit a reasonable finding that a person may suffer brain and/or neurocognitive injuries from playing football" and to exclude Dr. Benson on general causation as well.

## FACTUAL BACKGROUND

### A.    The seven bellwether plaintiffs sue Riddell alleging long-term brain injuries.

The seven remaining bellwether plaintiffs contend Riddell is liable for "long-term brain injuries" they allegedly developed from football-related head impacts while wearing Riddell helmets.[6] Under theories of negligence and strict liability, they contend Riddell defectively designed its helmets and failed to provide adequate warnings and instructions about the purported dangers of "playing football using [Riddell] helmets."[7]

The plaintiffs assert various combinations of over a dozen maladies, including depression, memory impairment, headaches, anxiety, irritability, and mood swings.[8] Some allege they

---

[6] (Pls.' First Am. Master Long-Form Compl. ¶ 205 (Nov. 2, 2018), ECF No. 184.)

[7] (Id. ¶ 202; see also, e.g., id. ¶¶ 203–204. 207, 218.)

[8] See, e.g., S. Green Second Suppl. Pl. Fact Sheet Nos. 25–26; Report of Paul E. Schulz, M.D., at p. 40 (regarding S. Green); J. Johnson Third Suppl. Pl. Fact Sheet Nos. 25–26; Dep. of J. Johnson 25:22–26:4, 27:11–28:11; G. Page Second Suppl. Pl. Fact Sheet Nos. 25–26; M. Sterns Second Suppl. Pl. Fact Sheet Nos. 25–26; M. Sterns Dep. 25:14–24; Report of Dr. Raymond A. Martin, at

developed symptoms while playing football, while others allege symptoms of their alleged maladies appeared years later.[9] The complained-of maladies are common in the general population.[10] The medical and scientific community has identified multiple risk factors for them unrelated to football, including age, family history, various lifestyle factors, and many more.[11]

**B.    Plaintiffs designate Dr. Benson on general and specific medical causation.**

Plaintiffs first disclosed Dr. Benson as their general causation expert and served a report signed by him that was almost completely cut-and-pasted from plaintiffs' complaint. In response to Riddell's motion to strike, plaintiffs denied that Dr. Benson's report was improperly ghost-written, pointing to Dr. Benson's purported reliance on "dozens of" scientific articles attached to his report.[12] Plaintiffs then designated Dr. Benson as their sole expert on specific medical causation and served seven[13] virtually identical reports purportedly written—but not signed—by him.[14] The seven reports also were near-verbatim copies of the general causation report plaintiffs already had served, but with the following additions in each:

> 2. It is my opinion that concussive and sub-concussive blows to the head suffered by this Plaintiff while playing tackle football caused mTBI and other brain injuries and symptoms cited by Plaintiff in this case and in the medial [sic] records I have reviewed. It is further my opinion that playing football and suffering these blows to the head while wearing a properly designed and engineered football helmet could have reduced the incidence and injuries suffered by these players.

---

pp. 4–5 (regarding M. Sterns); A. Whitby Second Suppl. Pl. Fact Sheet Nos. 25–26; W. Whitehorn Fourth Suppl. Pl. Fact Sheet Nos. 25–26; W. Whitehorn Dep. 26:16–21; J. Wodka Second Suppl. Pl. Fact Sheet Nos. 25–26, collectively attached as Ex. 1.

[9] *See, e.g.*, Whitby Dep. 166:11–167:20 (started having headaches freshman year of high school and had them continuously for the remainder of his football career), Ex. 2; Wodka Dep. 75:12–76:18 (first noticed memory issues in 2016, 31 years after last playing football), Ex. 3.

[10] (*E.g.*, Report of Dr. Robert Langer (Dr. Langer Rep.) at 7, ECF No. 365-3; Report of Dr. Christopher Randolph (Dr. Randolph Rep.) at 5, ECF No. 365-6.)

[11] (*E.g.*, Dr. Langer Rep. 27–29.)

[12] (Defs.' Mot. to Strike Dr. Benson & App'x 1 (Nov. 19, 2020), ECF Nos. 363, 363-1.)

[13] Plaintiffs served a total of eight reports, but one was for now-dismissed plaintiff Todd Bradford.

[14] Pls.' Specific causation Expert Disclosures (Dec. 11, 2020), Ex. 4.

3. This report covers specific causation between repetitive concussive and subconcussive football hits, and long-term brain injuries suffered by these Plaintiffs.[15]

As the Court observed, the seven reports "each include identical content; they do not reference the individual plaintiffs other than on the title page of each report, nor do they reference Riddell."[16] Riddell moved to strike Dr. Benson as plaintiffs' specific causation expert (and general causation) on the ground the reports were facially insufficient under Federal Rule of Civil Procedure 26(a)(2)(B).[17]

## C.     The Court grants summary judgment on plaintiffs' design defect claims based on Dr. Benson's failure to reliably link Riddell's helmet design with their claimed maladies.

In April of this year, the Court considered Riddell's motions to strike Dr. Benson's general and specific reports, exclude Dr. Benson from offering general causation and specific causation opinions, and grant summary judgment based on lack of evidence of general causation and specific causation. The Court granted summary judgment on plaintiffs' design defect claims. Observing that Dr. Benson's report itself suggested one must look to "scientific research and perhaps medical knowledge" to understand mild traumatic brain injuries, the Court agreed with Riddell "that the origin of the plaintiffs' injuries is not the sort of matter that would be obvious to a layperson."[18] It concluded that the report "does nothing to connect the plaintiffs' injuries with Riddell's designs," entitling Riddell to summary judgment on design defect.[19]

The Court, however, found that the general causation report Dr. Benson signed was "sufficient to permit a reasonable finding that a person may suffer brain and/or neurocognitive

---

[15] (Specific causation Rep. 2, attached as Ex. A to Defs.' Mot. to Exclude Dr. Benson (Dec. 21, 2020), ECF No. 375-2.)

[16] (Mem. Op. 7, ECF No. 409.)

[17] (Defs.' Mot. & Mem. in Supp. of Mot. to Strike & Exclude Pls.' Specific Causation Expert Randall Benson, M.D. (Dec. 21, 2020), ECF Nos. 374, 375.)

[18] (Mem. Op. 12–13, ECF No. 409.)

[19] (*Id.* at 13–14.)

injuries from playing football."[20] And after concluding the parties had not adequately addressed causation with respect to plaintiffs' warnings claims, it denied summary judgment as to those claims.[21] The Court found it unnecessary to address Riddell's remaining motions at that time.[22]

**D.     At his deposition, Dr. Benson admits his general causation report was largely copied from the complaint with "nothing very substantial" contributed by him, and denies having reviewed the articles referenced in it.**

Contrary to plaintiffs' representations in defending it, Dr. Benson revealed at his deposition that—as Riddell had argued—the general causation report dated August 26, 2020, was almost entirely ghostwritten and largely copied from the complaint. Dr. Benson testified he first spoke to plaintiffs' counsel by telephone on August 19, 2020, for about half an hour, and "there wasn't a lot of time between the 8-19 phone call and me signing off on this report" one week later.[23] When he received the report from counsel, "I think my impression was that it didn't need a lot of buffing, that it was—you know, with the exception of some typos that it was ready to go."[24] Dr. Benson could not say how long he spent reviewing the report, but whatever time he spent, he did not record or bill it to plaintiffs, even though his practice is to bill time over 10 minutes.[25] In all, other than correcting a few "typos" and changing "a word here or there," Dr. Benson's contribution to his purported general causation report was "nothing terribly substantial."[26]

He first tried to defend his lack of involvement in writing the general causation by claiming that counsel "drew from prior writings of mine largely when he put together that draft report, so it's fair to say that wasn't the first time that I had seen most of the writings in that draft."[27] Later,

---

[20] (*Id.*)
[21] (*Id.* at 14–15.)
[22] (*Id.* at 15.)
[23] Dep. of Randall Benson (Benson Dep.) at 12:23–13:6, 13:25–14:3, 24:24–25:4, Ex. 5.
[24] *Id.* at 24:15–19.
[25] *Id.* at 14:14–15, 19:20–22, 20:3–8, 26:3–10, 38:11–14, 45:3–5.
[26] *Id.* at 25:15–19.
[27] *Id.* at 21:14–18, 73:8–13, 73:23–75:4.

however, he agreed that multiple paragraphs of the report, in fact, were copied from the 2017 *Adams* complaint, which he did not write—as he testified: "Yeah, these are not my writings so it's clear that they're copied from a prior document, so it's clearly effectively copied and pasted from either this document [i.e., the 2017 *Adams* complaint] or some prior document."[28] He further testified:

> Q.     And the paragraphs in your report starting with 13 and going through 34 appear to be cut and pasted from the Mark Adams complaint with some minor editing by the plaintiffs' lawyer; would that be correct?
>
> A.     That seems to be the case.
>
> Q.     Okay. And so you did not yourself write Paragraphs 13 through 34 of your complaint or your report, correct, sir?
>
> A.     Correct.[29]

He next unequivocally admitted that the introductory paragraphs and conclusion of his report were also written by plaintiffs' counsel.[30]

Dr. Benson also refuted plaintiffs' representations about the bases of his purported opinions in the general causation report, including that "a wealth of . . . scientific, peer-reviewed articles that Dr. Benson specifically reviewed and relied upon" supported those opinions.[31] Plaintiffs' *Daubert* response attached an exhibit titled "Documents consulted upon" that was attached to the general causation report which listed "Science Day presentations" and 23 specific articles.[32] Dr. Benson, however, testified he had "no idea" what Science Day was and that he had not been provided with or reviewed the listed articles.[33]

---

[28] *Id.* at 76:9–13.
[29] *Id.* at 77:17–25.
[30] *E.g., id.* at 97:15–19.
[31] (Pls. Mem. in Opp. to Riddell's General Cause *Daubert* Mot. 6 (Dec. 28, 2020), ECF No. 382.)
[32] (*Id.* at Ex. 1, ECF No. 328-1 at 23.)
[33] Benson Dep. 52:4–16, 82:2–8.

7

E.     **On specific causation, Dr. Benson admits he did not review plaintiffs' medical records or otherwise analyze specific causation, denies the seven reports reflect his case-specific opinions, and confirms he, in fact, had not formed any case-specific opinions.**

At his deposition, Dr. Benson testified that he did not write paragraph two (above) of the report purporting to state his case-specific opinions and testified the statements in it were not true:[34]

> Q.   And someone wrote in here in Paragraph 2 of [a specific causation report] first "That it is my opinion that concussive and sub-concussive blows to the head suffered by this plaintiff while playing tackle football caused mTBI and other brain injuries and symptoms cited by Plaintiff in this case and in the medical records I have reviewed." Do you see that?
>
> A.   I do see that.
>
> Q.   You did not write that, did you?
>
> A.   No, I did not.
>
> Q.   That is not a true statement, is it?
>
> A.   Well, it's not a true statement certainly because I haven't reviewed any medical records.
>
> ***
>
> Q.   And you've not made any opinion or determination about whether or not this plaintiff had any mTBI, brain injury, or symptom, correct?
>
> A.   That's correct.
>
> Q.   And you've made no determination, if such an injury occurred what its cause might be, correct?
>
> A.   Correct.[35]

Dr. Benson further testified he had not reviewed any plaintiffs' medical records; examined or interviewed any plaintiff; reviewed any plaintiff's discovery responses, fact sheets, or other disclosures; performed any work specific to any plaintiff; formed any opinions specific to any plaintiff; applied the methodology he typically uses for assessing a plaintiff's alleged neurological

---

[34] Objections to deposition questions and responses are omitted from quotations without waiver of the right to later assert those objections.

[35] Benson Dep. 95:12–96:1, 96:14–20; *see also id.* at 99:13–23 (stating that conclusory paragraphs 37 and 38 "clearly are implying some foreknowledge or specific refence to a plaintiff which, as I've said numerous times, I don't have that information.").

injury, and that he had no case-specific opinions as to any plaintiff. [36] As Dr. Benson confirmed, as of his deposition, he had performed "no specific causation analysis."[37] And he admitted that his reports contained no methodology for determining the cause of plaintiffs' alleged maladies.[38]

**F.**     **In response to Riddell's motion for terminating sanctions based on plaintiffs' misrepresentations and submission of fraudulent reports, plaintiffs attempt to rehabilitate Dr. Benson by submitting a curt declaration contradicting parts of his sworn testimony and claiming he was "confused" and "mistaken" throughout his six-hour deposition.**

After Dr. Benson's deposition revelations—including that he did not author and hadn't previously seen the specific causation reports, hadn't reviewed any medical records, and had no specific causation opinions—Riddell moved for terminating sanctions and other appropriate relief.[39] In response, plaintiffs asserted that Dr. Motley provided "mistaken testimony;" was "confused over which reports were being discussed"; "mistakenly stated he was unfamiliar with certain portions of the report"; was "not sufficiently prepar[ed]" for his deposition such that he could not recollect "his work done on this case"; and made "misstatements" throughout the course of his testimony.[40] They also submitted an 11-paragraph declaration from Dr. Benson purporting to refute his admissions in conclusory fashion; for instance, by reciting that he "drafted, reviewed and approved the general causation reports and the specific causation reports prior to their service on Defendants' counsel," and holds the opinion "that these Plaintiffs each have individualized specific symptoms" attributable to "repeated blows to the head playing football."[41]

Other than invoking mistake and confusion, however, Plaintiffs do not explain Dr. Benson's 180-degree about-face. Nor do they explain how Dr. Benson supposedly performed the

---

[36] *Id.* at 20:16–28:7, 59:18–65:4, 100:21–104:21.
[37] *Id.* at 61:10–61:12.
[38] *Id.* at 121:12–18.
[39] (Defs.' Terminating Sanctions Mot.)
[40] (Pls.' Resp. Mem. 6, 7, 8, 17.)
[41] (Ex. B to Pls.' Resp. Mem., ECF No. 421-2.)

necessary work to develop his putative case-specific opinions when he testified under oath that he (1) billed a total of less than one hour on this litigation since he was first retained last August, (2) did no work between the date he signed the general causation report and plaintiffs' service of the purported case-specific reports, and (3) has not performed any of the analyses he testified his methodology entails to perform case-specific studies.[42] Plaintiffs also ignore that Dr. Benson's billing records and his "complete" file corroborate the admissions he made in his deposition.

## ARGUMENT

Early in the litigation, the Court identified plaintiffs' dual medical-causation burden. They must first establish that an exposure to repetitive head impacts can cause the maladies plaintiffs allege (general causation). Then each plaintiff must establish that the product or exposure more likely than not *did* cause his specific constellation of alleged maladies (specific causation).[43] The Court has also recognized that expert testimony is required to address "the origins of the plaintiffs' injuries."[44] Dr. Benson's deposition testimony confirms that plaintiffs lack the expert testimony necessary to establish specific (and general) causation—and that they certainly have none that meets the reliability standards of Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[45]

## I. Dr. Benson did not even offer specific causation opinions, let alone apply a reliable methodology to reaching any such opinions.

The testimony quoted above alone forecloses plaintiffs from establishing specific causation. The bottom line is that Dr. Benson did not analyze specific causation, and plaintiffs served fraudulent reports that Dr. Benson did not author containing purported opinions he did not hold supposedly based on materials he neither had nor reviewed (e.g., plaintiffs' medical

---

[42] (*See generally* Pls.' Resp. Mem.)
[43] (Mem. Op. 6–7, ECF No. 182.)
[44] (Mem. Op. 12–13, ECF No. 409.)
[45] 509 U.S. 579 (1993).

records).[46] Riddell, however, briefly addresses reliability in an abundance of caution should plaintiffs try to claim otherwise, as their response on terminating sanctions shows they will.

Under Rule 702, an expert's opinions are not admissible if they will not help the trier of fact understand the evidence or determine a fact in issue, are not based on sufficient facts and data, or are not the product of reliable "principles and methods" reliably applied to the facts of the case.[47] The Seventh Circuit has repeatedly stated that even a qualified expert must show he used "some recognized scientific method" to arrive at opinions that are "are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."[48] The party proffering the expert testimony must establish "the pertinent admissibility requirements"—including reliability—by a preponderance of the evidence.[49] That means showing the proposed testimony "is based on the scientific method.[50]

This Court has recognized that specific causation "must be determined . . . on a plaintiff-by-plaintiff basis."[51] The most common scientific method for deriving a reliable specific causation opinion is differential etiology, sometimes called differential diagnosis.[52] It is a methodology for experts, not laypersons or lawyers.[53] The expert first "'rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient,'" determines "the likely cause of the ailment."[54]

---

[46] (*See generally* Defs.' Terminating Sanctions Mot.)

[47] Fed. R. Evid. 702(a)–(d).

[48] *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

[49] *Rasmusen v. White*, 970 F. Supp. 2d 807, 813 (N.D. Ill. 2013).

[50] *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000).

[51] (Mem. Op. 7, ECF No. 182.)

[52] *In re Testosterone Replacement Therapy Prod. Liab. Litig.* ("*In re TRT*") No. 14 C 1748, MDL No. 2545, 2017 WL 1833173, at *17 (N.D. Ill. May 8, 2017) (Kennelly, J.).

[53] *See Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ("Differential diagnosis is and accepted and valid methodology *for an expert* to render an opinion about the identity of a specific ailment." (emphasis added)).

[54] *In re TRT*, 2017 WL 1833183, at *17 (quoting *Myers*, 629 F.3d at 644).

Here, plaintiffs' claimed maladies are common in the general population, making a reliable differential etiology particularly critical to a reliable specific causation opinion.[55] Yet the purported specific causation reports do not reflect application of a differential etiology—or any other method for determining specific causation, for that matter—because Dr. Benson did not perform one. Nor did he apply any other recognized and reliable methodology for determining specific causation. Indeed, he could not have, given that he did not review any plaintiffs' medical records, examine or interview any plaintiff, or—by his own admission—apply the methodology he typically uses for assessing a plaintiff's alleged neurological injury.[56]

While plaintiffs might try to point to Dr. Benson's affidavit in connection with their defense to Riddell's terminating sanctions motion, that affidavit is nothing more than a classic "sham affidavit," which the Court can and should summarily disregard.[57] Indeed, the sham-affidavit doctrine applies when, as here, the affidavit contradicts and is "inherently inconsistent" with the prior sworn testimony, and "the discrepancies are 'incredible and unexplained.'"[58] Dr. Benson's deposition testimony is 180 degrees opposite of his affidavit on every relevant point. His affidavit offers no explanation whatsoever for this wild inconsistency and contradiction. Meanwhile, plaintiffs' counsel's bald cries of "confusion" and "mistake" are wholly incredible, given that any suggestion that Dr. Benson performed case-specific analyses for case-specific opinions is squarely refuted by the facts. Those facts include the absence of any billing records reflecting such work, the lack of any supporting materials for the testing and workup Dr. Benson said he would need to

---

[55] (*E.g.*, Dr. Langer Rep. 7, 11; Dr. Randolph Rep. 5.)

[56] Benson Dep. 20:24–1, 102:18–20, 103:2–20, 104:2–9.

[57] *Breuder v. Bd. of Trustees of Comm. Coll. Dist. No. 502*, No. 15 CV 9323, 2021 WL 4125084 (N.D. Ill.Sept. 9, 2021) (analyzing whether an affidavit submitted by a non-party witness on a motion to compel that witness to produce documents should be stricken under the "sham-affidavit" rule) (citing *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020)).

[58] *Gavin/Solmonese LLC v. Kunkel*, No. 16-CV-1086, 2019 WL 1125792, at *1 (N.D. Ill. Mar. 12, 2019) (quoting *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004)).

perform to develop case-specific opinions, and his admitted failure to examine or interview any plaintiff or review their medical records—among many other indisputable indicia showing his affidavit to be a sham.

In any case, far from salvaging their case-specific causation case, plaintiffs' response to Riddell's sanctions motion and Dr. Benson's mechanical affidavit recitations diametrically opposed to his sworn testimony only make matters worse. First, one cannot plausibly argue that an expert who gave unequivocal answers to clear questions for over six hours, but who then— without explanation—offered wholly contradictory and entirely conclusory statements repudiating that testimony, is capable of providing reliable testimony to a jury.

Second, the putative basis for Dr. Benson's new-found specific causation opinions does not withstand scrutiny. He now purports to base these opinions on plaintiffs' fact sheets (despite testifying he never reviewed them), phone logs prepared by someone in his office that he testified he had not verified or seen before his deposition, and a telephone discussion—not lasting more than 30 minutes, per his records and deposition testimony—with plaintiffs' counsel about plaintiffs' alleged symptoms.[59] Yet even in his declaration, Dr. Benson still does not claim to have seen any medical records, or reviewed any plaintiff's deposition testimony about his playing and medical history, or conducted any of the imaging, testing, or examinations he typically would perform in evaluating alleged neurological injuries. And he does not even identify—much less reliably rule out—any potential alternative causes of the common and largely subjective maladies plaintiffs claim. Such fundamental failures to follow even the first rudimentary steps of a proper methodology is grounds for exclusion.[60]

---

[59] (Ex. B to Pls.' Resp. Mem.); *also* Benson Dep. 13:21–14:3 (describing extent of work done on matter before date of his deposition).

[60] *See In re TRT*, 2017 WL 1833173 at *22 (excluding expert's specific causation opinion based on failure to rule out plausible alternative causes, stating "[o]ne cannot . . . simply take [expert's]

In short, it would be bad faith for plaintiffs to claim that the seven falsified reports or any testimony by Dr. Benson (1) constitutes a specific causation opinion as to any plaintiff, or (2) passes muster under Rule 702 and *Daubert*. Nonetheless, Plaintiffs apparently intend to do just that, based on their response to Riddell's sanctions motion. Plaintiffs' insistence that Dr. Benson has applied any reliable methodology to arrive at any legitimately case-specific opinions here finds no support in the record, Dr. Benson's testimony, the facts, the law, or basic logic and common-sense. The Court should preclude Dr. Benson from offering any testimony on specific causation.

## II. The Court should vacate its finding that Dr. Benson's purported general causation report suffices to permit a reasonable finding that football can cause neurocognitive injuries.

Dr. Benson admitted he did not write the general causation report, including, in particular, the paragraphs purporting to express "opinions" about general causation.[61] Dr. Benson also testified, contrary to plaintiffs' repeated representations to the Court, that he had not been provided with nor reviewed the Science Day presentations and the articles listed as "consulted upon" in an exhibit to the report.[62] These concessions gut plaintiffs' *Daubert* defense of his putative general causation "opinions"—for instance, that he "refuted" Riddell's *Daubert* challenges and provided "conclusions" that were "bolstered by numerous studies published over the last few years."[63]

The Court's finding that a portion of Dr. Benson's report was sufficiently reliable under Rule 702 and *Daubert* necessarily rested on plaintiffs' representation—now proven false—that the

---

unsupported word that because [drug] can cause heart attacks, it was a specific cause of [the plaintiff's] injury"); *also Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 706 (7th Cir. 2009) (affirming exclusion of expert's causation opinion where expert relied on information supplied by plaintiff without examining medical records, failed to explain "interplay" between prior diagnosis and current symptoms, and did not "consider and discount" other potential causes).

[61] *See* Benson Dep. 77:17–25 (conceding that paragraphs 13–34 of the general causation report were copied from plaintiffs' complaint and not written by him).

[62] *Id.* at 52:4–16, 82:2–8.

[63] (Pls. Mem. in Opp. to Riddell's General Cause *Daubert* Mot. 9–10, ECF No. 382.)

report expressed Dr. Benson's expert opinions, not the mere allegations of counsel. After all, if attorney allegations and scientific articles untethered to expert testimony sufficed to raise a jury issue on medical causation (they do not), then no expert would be needed to explain the evidence or help the jury decide the issues.[64] But the report did not reflect Dr. Benson's opinions, as he has now testified under oath.

Dr. Benson's testimony also confirms he didn't do the work required to generate a reliable general causation opinion. He spent a total of about 30 minutes working on these cases (talking with plaintiffs' counsel) before plaintiffs' counsel sent him the draft report to proofread and sign. His review of that draft report apparently took so little time that Dr. Benson did not even bill for it. And he testified that he had not, in fact, analyzed or even read the articles attached to the general causation report, leaving him no scientific support for putative general causation opinions. Such cursory *ipse dixit* comes nowhere close to the level of rigor needed to pass Rule 702 and *Daubert* muster. Accordingly, Riddell respectfully asks the Court to vacate the following finding: "Dr. Benson's report is sufficient to permit a reasonable finding that a person may suffer brain and/or neurocognitive injuries from playing football."[65]

## CONCLUSION

For the foregoing reasons, Riddell respectfully asks the Court to grant its motion to exclude Dr. Benson from testifying on specific and general causation and to vacate its prior finding relying on Dr. Benson's purported general causation report.

Respectfully submitted,

Dated:  September 30, 2021

**BOWMAN AND BROOKE LLP**

By:    */s/ Paul G. Cereghini*
       Paul G. Cereghini (*Pro Hac Vice*)

---

[64] *See* Fed. R. Evid. 702(a).
[65] (Mem. Op. 13–14, ECF No. 409.)

BOWMAN AND BROOKE LLP
2901 North Central Avenue, Suite 1600
Phoenix, AZ 85012
Telephone: (602) 643-2300
Facsimile:  (602) 248-0947
paul.cereghini@bowmanandbrooke.com

Robert L. Wise
Eden M. Darrell
BOWMAN AND BROOKE LLP
901 East Byrd Street, Suite 1650
Richmond, VA  23219
Telephone: (804) 649-8200
Facsimile:  (804) 649-1762
rob.wise@bowmanandbrooke.com
eden.darrell@bowmanandbrooke.com

David J. Duke
BOWMAN AND BROOKE LLP
2901 Via Fortuna Drive, Suite 500
Austin, TX  78746
Telephone: (512) 874-3800
Facsimile: (512) 874-3801
david.duke@bowmanandbrooke.com

Mark H. Boyle
Thomas Cushing
DONOHUE BROWN MATHEWSON &
SMYTH LLC
140 South Dearborn Street, Suite 800
Chicago, IL 60603
Telephone: (312) 422-0900
Facsimile:  (312) 422-0909
mark.boyle@dbmslaw.com
cushing@dbmslaw.com

*Attorneys for the defendants*

16

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2021, the foregoing was filed with the Clerk using the CM/ECF system, which will provide notice to all counsel of record.

> */s/ Paul G. Cereghini*
> Paul G. Cereghini *(Pro Hac Vice)*
> BOWMAN AND BROOKE LLP
> 2901 North Central Avenue, Suite 1600
> Phoenix, AZ 85012
> Telephone: (602) 643-2300
> Facsimile: (602) 248-0947
> paul.cereghini@bowmanandbrooke.com
>
> Robert L. Wise
> Eden M. Darrell
> BOWMAN AND BROOKE LLP
> 901 East Byrd Street, Suite 1650
> Richmond, VA 23219
> Telephone: (804) 649-8200
> Facsimile: (804) 649-1762
> rob.wise@bowmanandbrooke.com
> eden.darrell@bowmanandbrooke.com
>
> David J. Duke
> BOWMAN AND BROOKE LLP
> 2901 Via Fortuna Drive, Suite 500
> Austin, TX 78746
> Telephone: (512) 874-3800
> Facsimile: (512) 874-3801
> david.duke@bowmanandbrooke.com
>
> Mark H. Boyle
> Thomas Cushing
> DONOHUE BROWN MATHEWSON &
> SMYTH LLC
> 140 South Dearborn Street, Suite 800
> Chicago, IL 60603
> Telephone: (312) 422-0900
> Facsimile: (312) 422-0909
> mark.boyle@dbmslaw.com
> cushing@dbmslaw.com
>
> *Attorneys for the defendants*

17